417 A.2d 1163

COMMONWEALTH of Pennsylvania

v.

Jerome PARKS, Appellant.

Superior Court of Pennsylvania.

Submitted March 23, 1979.

Filed Dec. 21, 1979.

510

John W. Packel, Assistant Public Defender, Philadelphia, for appellant.

Eric B. Henson, Assistant District Attorney, Philadelphia, submitted a brief on behalf of the Commonwealth, appellee.

Before PRICE, SPAETH and LIPEZ, JJ.

SPAETH, Judge:

This is an appeal from judgment of sentence for burglary,[1] conspiracy,[2] and four counts of robbery.[3] Appellant has assigned three trial errors, which we shall consider in a somewhat different order than he presents them.

–1–

On September 27, 1976, a robbery occurred at the house of Gladys Drayton at 806 South 13th Street in Philadelphia. Deborah Battles testified that while watching television in the front room of the house, she saw four men, including appellant, enter the house and proceed to the dining room. She also testified that two of the men remained in the dining room during commission of the robbery, but that appellant was not one of the two. (N.T. 244–50) In the initial part of her testimony, Ms. Battles said that she had seen all four of the men before the date of the robbery:

Q: In fact, had you ever seen these persons before?

A: Out on the street.

Q: You had seen them?

A: Yes. (N.T. 244)

Later in her testimony, Ms. Battles said that she had never seen appellant before the date of the robbery. (N.T. 254)

1. 18 Pa.C.S.A. § 3502 (1973).

2. 18 Pa.C.S.A. § 903 (1973).

3. 18 Pa.C.S.A. § 3701 (1973).

Appellant was tried with two other defendants—Steven A. Johnson and Van S. McWhorter. When counsel for co-defendant Johnson cross-examined Ms. Battles regarding the apparent inconsistency in her testimony as to when she had first seen appellant, the following occurred:

BY MISS DUFFY [counsel for co-defendant Johnson]:

Q. Miss Battles, did you testify at the last hearing we had, last time you were in this courtroom testifying, that you knew all four of them because you've seen all four men around?

A. I said I knew them, or did I say I seen them?

Q. You said you saw all four of them. Now, is it my understanding that today you're admitting that you did not see Parks [appellant] before?

A. Yeah.

Q. So that you weren't telling the truth when you testified at the last hearing, were you, Miss Battles?

A. It could be that I don't want to testify, period.

Q. Well, now, you indicated that—

MR. SNEE [counsel for appellant]: Objection, Your Honor.

MR. DIVITO [counsel for co-defendant McWhorter]: Objection, Your Honor. Can we see you at sidebar?

(A conference was held at sidebar as follows:)

MR. DIVITO: Your Honor, I think under the circumstances that perhaps a colloquy should be conducted of this witness at this time to further explore what she means by the statement that she doesn't—"It could be that I don't want to testify." Certainly, this could be done out of the presence of the jury, and I think under the circumstances we should explore precisely what this means, and then, after that, determine a further course as to what instruction may be necessary to the jury.

THE COURT: If your objection is a request to colloquy this witness, it is overruled. That's what I understand your objection to be.

MISS DUFFY: But, Your Honor, she has identified everybody in our case. Why is she—the only reason she would be reluctant to testify is because she's worried about—she's committed herself to the Commonwealth and is now afraid to go back on it.

MR. KITROSSER [the assistant district attorney]: Then explore it.

THE COURT: Are you objecting, Miss Duffy?

MISS DUFFY: Am I objecting? Yes, of course.

THE COURT: And is your objection in the nature of a request that I colloquy this witness at this time?

MISS DUFFY: Outside the presence of the jury.

THE COURT: It is overruled.

MR. SNEE: My objection, Your Honor, is that she implies my man is the only one that she's changed her testimony. She says maybe because she doesn't want to testify. It's a clear implication against my man that she may have been threatened. He's the only one in regard to which she's changed her testimony. And, therefore, unless there's clarification of this matter, I would move for a mistrial.

MR. DIVITO: I join in that motion.

MISS DUFFY: I join in that motion.

THE COURT: Three motions for mistrial are denied.

(Sidebar conference ended.) (N.T. 271–73)

Appellant argues that the trial judge erred in denying his motion for a mistrial. In support of his argument, appellant cites *Commonwealth v. Markle*, 239 Pa.Super. 505, 361 A.2d 826 (1976). In *Markle*, a police witness testified that as a result of cooperating with the police in the prosecution of the defendant, a co-conspirator had received threats to his life. The trial judge sustained the defendant's objection to the testimony but denied his request for an offer of proof, and also his motion for a mistrial. Judge HOFFMAN, in an opinion joined by President Judge WATKINS, found revers-

ible error in this denial of the requested offer of proof.[4] They held that the court should have granted the requested offer, and then have determined whether the probative value of the evidence outweighed its prejudicial impact, going on to say that if it developed that the Commonwealth could not prove that the defendant had indeed threatened the co-conspirator, a mistrial should have been declared. *Id.,* 239 Pa.Super. at 516–17, 361 A.2d at 831. In a concurring opinion, in which I joined, Judge CERCONE held that any error had been cured by the trial judge's instruction to the jury to disregard the testimony and to refrain from interpreting it as evidence against the defendant.[5]

 Appellant's reliance on *Markle* is misplaced for several reasons. First, appellant did not request an offer of proof by the Commonwealth, as did defense counsel in *Markle.* Second, appellant complains that no curative instructions were given, as in *Markle* ; but he never requested them. Finally, the level of prejudice inherent in the testimony does not rise to the level in *Markle.* In *Markle,* the challenged testimony was as follows:

Q. Do you know whether or not Mr. Hendricks, as a result of his cooperation with the police, has ever had any threats made upon his life?

A. He has.

239 Pa.Super. at 513, 361 A.2d at 829.

It was an obvious inference from this testimony that the threats had been made by the defendant. The danger of prejudicing the jury was therefore clear. By contrast, the only testimony in the present case was a one-line response by a witness who simply said that she did not want to testify. There was no obvious or even reasonable inference

**4.** It should be noted that this opinion is attributed to HOFFMAN and JACOBS, JJ., in 239 Pa.Super. 505, 361 A.2d 826 (1976). This is incorrect. The correct version is that stated in 239 Pa.Super. 505, attributing the opinion to HOFFMAN, J., joined by President Judge WATKINS.

**5.** While Judge CERCONE and I agreed with Judge HOFFMAN and the President Judge that the defendant was entitled to a new trial, we found reversible error on other grounds.

from this statement that appellant had threatened the witness about testifying against him. One may readily suppose a number of reasons, including resentment at being charged by cross-examining counsel with not telling the truth, why the witness might have said what she did.

Appellant also argues that the trial judge should have questioned Ms. Battles outside the presence of the jury to clarify her statement that she did not want to testify. Whether appellant has preserved this issue for our consideration is less than clear on the record. As appears from the transcript, which has been quoted above, counsel's objection was: "[U]nless there's clarification of this matter, I would move for a mistrial." (N.T. 273) This objection followed a request for *in camera* examination of the witness made by co-defendant McWhorter's counsel. It is possible that appellant intended his objection to mean that unless the judge clarified the testimony by granting co-defendant counsel's request for *in camera* questioning by the judge, he would move for a mistrial. On this possibility, we shall treat the issue as preserved for appeal.

While we have found no case authority precisely on point,[6] it has long been the law of Pennsylvania that the trial judge may question a witness for the judge's own information, to clarify evidence, to give the witness an opportunity to explain himself, and to serve other goals in the advancement of justice. *Commonwealth v. Wilson*, 431 Pa. 21, 244 A.2d 734 (1968); *Bickel v. Philadelphia Wood Paving Co.*, 2 Walk 150 (Pa.1881); *Commonwealth v. Hodge*, 246 Pa.Super. 71, 369 A.2d 815, 819 (1977). In some circumstances, our Su-

---

**6.** According to Wigmore:

One of the natural parts of the judicial function, in its orthodox and sound recognition, is the judge's power and duty to put to the witness such additional questions as seem to him desirable to elicit the truth more fully.

3 J. Wigmore, Evidence in Trials at Common Law § 784 at 189 (Chadbourn rev. ed. 1970).

McCormick states that

[i]t is sometimes said that the judge may have a duty to question witnesses, although the exercise of such a duty does not appear to have been enforced by any appellate court decisions.

McCormick, Handbook of the Law of Evidence § 8 at 12.

preme Court has held that it may even be the trial judge's duty to interrogate a witness, so long as he does not manifest bias or unduly protract the proceedings. *Commonwealth v. Watts*, 358 Pa. 92, 96, 56 A.2d 81, 83 (1948).[7]

■ Here, no doubt, the trial judge might have chosen to question Ms. Battles outside the presence of the jury. We cannot say, however, that he was under the duty to do so. In *Commonwealth v. Myma*, 278 Pa. 505, 508, 123 A. 486, 487 (1924), *overruled on other grounds*, the Supreme Court stated that "[w]itnesses should be interrogated by the judge only when he conceives the interest of justice so requires. It is better to permit counsel to bring out the evidence and clear up disputed points on cross-examination unaided by the court . . . ." Here, Miss Duffy, counsel for co-defendant Johnson, had started to try to clear up the disputed point. When Ms. Battles said, "It could be that I don't want to testify, period," counsel started to ask another question ("Well, now, you indicated that . . . ."). At this point, Mr. Snee, appellant's counsel, objected. Then Mr. DiVito, counsel for co-defendant McWhorter, asked the judge to question Ms. Battles outside the presence of the jury. It seems likely that the judge concluded that the several defense counsel were at cross-purposes: one wanted to question the witness; the second objected to the questioning; and the third wanted the witness questioned, but by the judge, and outside the presence of the jury. In these circumstances it was well within the judge's discretion to decide not to inject himself, but to leave it to counsel, either to pursue the issue, as the assistant district attorney suggested, or to drop it. Especially is this so given the relatively ambiguous and innocuous nature of Ms. Battles's statement that she didn't want to testify.

-2-

On cross-examination by counsel for co-defendant McWhorter, Ms. Battles testified as follows:

7. *See Commonwealth v. Lanza*, 228 Pa.Super. 300, 323 A.2d 178 (1974).

Q. [BY MR. DIVITO] When you were interviewed by the police, either at the house or at 24th and Wolf, did you ever give a description of anybody that was involved in this?

A. No.

Q. So, you never told any police officer or detective or any other type of investigator about what these people looked like?

A. No, I didn't.

Q. Do you know if anybody else did that was in the house?

A. Jeffrey Savage.

Q. Okay. Was Jeffrey Savage in the house?

A. No, he wasn't in there. He was outside.

Q. You're sure?

A. I'm positive.

Q. Okay.

MR. SNEE [counsel for appellant]: Objection, Your Honor, unless she was there at the time.

MISS DUFFY [counsel for co-defendant Johnson]: I object, Your Honor, too. I don't see how she could know who was outside, Your Honor.

MR. SNEE: And on the grounds of hearsay.

THE COURT: How do you know Jeffrey Savage was outside the house?

THE WITNESS: He was out there when the boys left the house.

THE COURT: How do you know?

THE WITNESS: Huh?

THE COURT: How do you know?

THE WITNESS: He came—like when he came up, he was going with my grandmother down the street to chase the boys; then he stopped the told the cops what they looked like.

MR. SNEE: Objection, Your Honor, unless she heard exactly what he said. And even if she did, it's hearsay.

THE COURT: Did you hear what Jeffrey Savage said?

THE WITNESS: Yes, I heard what Jeffrey Savage said.

MR. SNEE: I still object, Your Honor, on the grounds of hearsay.

MISS DUFFY: Objection.

THE COURT: Objection is overruled. Both objections are overruled. (N.T. 326–27)

 The Commonwealth first contends that appellant waived his right to appeal the admission of this evidence by failing to object immediately after Ms. Battles first mentioned the name, Jeffrey Savage. In *Commonwealth v. Farris*, 251 Pa.Super. 227, 380 A.2d 486 (1977), this court held that when objectionable evidence appears not in the question asked of a witness but in his answer, a prompt objection to the answer is timely. *Id.*, 251 Pa.Super. at 280–81, n. 1, 380 A.2d at 488 n. 1. Here, the objected to evidence did not appear in counsel's question about the identity of the non-declarant, but rather during further questioning by the trial judge about Savage's location at the time witness Ms. Battles saw him, and what he appeared to be doing at that time. These questions by the judge were promptly objected to by appellant's counsel, as the transcript quoted above shows. Appellant's counsel objected as soon as Ms. Battles was asked whether she was positive that Savage was outside the house, and repeated his objection when the judge persisted and elicited an answer. In addition, counsel again stated his objection at sidebar:

MR. SNEE: Thank you, Your Honor. Your Honor, this is the precise reason why it's been offered, is for the truth of it. It's essential. We haven't found anyone yet who gave a description to the police, and to allow hearsay evidence that someone who's not even here gave such a description is to me the worst kind of hearsay. It's being offered

solely for the truth of the fact that a description was given to the police. (N.T. 328)

The Court, however, again overruled the objection. *Id.*[8]

■ In our opinion, the objection was well taken, and should have been sustained. If Ms. Battles had testified as to the contents of Jeffrey Savage's remarks to the police, the testimony would plainly have been hearsay; it would have been an assertion by someone not in court (Savage), offered for its truth (that Savage did describe appellant to police as one of the robbers), and dependent for its value on the credibility of the non-testifying declarant. *See generally* McCormick on Evidence § 246 (Cleary ed. 1972). While this was not the case, Ms. Battles's testimony that she heard Jeffrey Savage give the police a description of appellant, when considered in context, represented indirect hearsay.

If the apparent purpose of offered testimony is to use an out of court statement to evidence the truth of facts stated therein, a hearsay objection cannot be obviated by eliciting the purport of the statements in indirect form. Thus evidence as to the purport of "information received" by the witness, or a statement of the result of investigation made by other persons, offered as evidence of the facts asserted out of court, have been held to be hearsay. McCormick, *supra* § 249 at 593–94.

*And see Commonwealth v. Farris, supra* (indirect hearsay where detective testified that accomplice to robbery made statement to him, as result of which he arrested defendant).

8. The Commonwealth has also argued that the testimony was admissible as an invited response to co-defendant counsel's question to Ms. Battles whether she knew if anyone had described the assailants to police. It is true that "[w]here a question is put to a witness which cannot be answered as put, without including in the answer a statement of fact as explanation, complaint cannot be made that the witness added the necessary explanation. . . ." *Commonwealth v. Dalton*, 199 Pa.Super. 388, 393–94, 185 A.2d 653, 656, *allocatur refused*, 200 Pa.Super. xxxi (1962); *Commonwealth v. McGonigle*, 228 Pa.Super. 345, 323 A.2d 733 (1974). However, here the witness was responding to cross examination by co-defendant's counsel, and to questions by the trial judge, not by appellant's counsel. Furthermore, it is not an inescapable conclusion that the witness had to include the hearsay statement in order to provide an acceptable answer.

It is true that the police officer in the present case did not testify that he arrested appellant as a result of the non-declarant's description to the police (which would have made this case closer to *Farris*). However, the jurors could have inferred that it was Jeffrey Savage's description of a robber that formed the based for the radio message that the officer later heard and on the basis of which he arrested appellant.

We nevertheless have concluded that the trial judge's error was harmless beyond a reasonable doubt. Our Supreme Court has held that error is harmless only when the appellate court determines that the error could not have contributed to the verdict. *Commonwealth v. Story*, 476 Pa. 391, 383 A.2d 155 (1978). Whenever there is a "reasonable possibility" that an error "might have contributed to the conviction," the error is not harmless. *Commonwealth v. Davis*, 452 Pa. 171, 178, 305 A.2d 715, 719 (1973), *quoting Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). To make such a determination, the court must examine the uncontradicted prosecution evidence and decide whether it is overwhelming in comparison to the improperly admitted evidence. For example, in *Commonwealth v. Slaughter*, 482 Pa. 538, 394 A.2d 453 (1978), the trial judge admitted the hearsay statement of a police officer who testified on redirect examination, naming two people who had identified the defendant as the perpetrator of the crime. Our Supreme Court held that this admission was error harmless beyond a reasonable doubt in view of the fact that the officer's testimony added nothing to the prosecution's case that other testimony had not already revealed. Here, there was testimony from the victim of the robbery, Ms. Gladys Drayton, identifying appellant as one of the four men who entered the house and announced a robbery. Also, Ms. Deborah Battles identified appellant as one of the men who entered her house. (N.T. 244–45) Finally, Police Officers Ronald Simerson and Joseph McGolrick, who were conducting a surveillance of the street on which the robbery occurred, both testified that appellant was one of the two men who entered the house, emerged shortly thereafter, and

fled on bicycles. (N.T. 399–420, 564–571)[9] Given these identifications,[10] we conclude that Ms. Battles's testimony that she overheard Jeffrey Savage providing police a description of the fleeing robbers could not have contributed significantly to the verdict reached.[11]

–3–

The third issue appellant raises is whether the trial judge denied appellant his right to a verdict based on the independent judgments of the jurors when he instructed them to initial their verdict slips in preparation for polling. The instruction was as follows:

It sometimes occurs that a jury is polled, which means that after the foreman gives the verdict, the jurors are asked individually to rise and announce the verdict, also.

**9.** As is apparent, there was a discrepancy in the testimony about the precise number of men who entered the house. Gladys Drayton testified that four men entered the house. The police officers testified that they saw only two men enter. However, all three of these witnesses agreed in their identification of appellant as one of the men who entered the house at the time of the robbery.

**10.** While three other witnesses testified as to their observations during the robbery, none provided evidence that would have exonerated the appellant. Witnesses Harry McNeal and James Dixon could not identify any participants in the crime. Witness Alfonso Hart stated that he saw two co-defendants enter the house. This testimony does not contradict the direct testimony of prosecution witnesses that appellant was one of the men at the house when the robbery occurred.

**11.** The Commonwealth has argued that the evidence of Jeffrey Savage's description was admissible as an excited utterance. An excited utterance has been defined as

. . . a spontaneous declaration by a person whose mind has been suddenly made subject to an overpowering emotion caused by some unexpected and shocking occurrence, which that person had just participated in or closely witnessed, and made in reference to some phase of that occurrence which he perceived, and this declaration must be made so near the occurrence both in time and place as to exclude the likelihood of its having emanated in whole or in part from his reflective faculties.

*Allen v. Mack*, 345 Pa. 407, 410, 28 A.2d 783, 784 (1942); *Commonwealth v. Pronkoskie*, 477 Pa. 132, 383 A.2d 858 (1978). Here there is insufficient evidence to determine whether Savage's description to police was the product of overpowering emotion.

Therefore, of course, you must have in mind the results. I would ask, after the foreman makes the necessary entries on the verdict slip, that each person individually review the verdict slips, make sure that it's accurate and make sure that that's in accord with your decision and entered properly, and after you have done so, put your initials on the verdict slip, on each one, indicating to you and to everyone else that you have reviewed that verdict slip and that it is written in accordance with your views and the jury as a whole. (N.T. 907–908)

Appellant made a timely exception to this instruction: I have one last point, if Your Honor please, and that is something I've never heard before, having them (the jurors) put their initials on the verdict slip. I can see the reasons for doing this, but I would be inclined to think it might interfere with the object of polling the jury; in other words, may tie them down in a way that they should not be tied down, because they may change their mind at any time up until the verdict is announced in open court. (N.T. 921–22)

After the jury rendered its verdict, counsel requested an instruction that the jurors were free to change their verdict. The trial judge denied this request. (N.T. 941–42) Appellant's counsel then requested that the jury be polled; it was, and affirmed its verdict. (N.T. 943)

 It is settled that a defendant has the right to poll the jurors after their verdict has been announced. This practice has its roots in ancient common law. 2 Hale, Pleas of the Crown 299, and continues to prevail. *Commonwealth v. Martin*, 379 Pa. 587, 109 A.2d 325 (1954); *Commonwealth v. Pacini*, 224 Pa.Super. 497, 504, 307 A.2d 346 (1973). Its purpose is to determine

whether the jury's verdict reflects the conscience of each of the jurors or whether it was brought about through the coercion or domination of one of them by some of his fellow jurors or resulted from sheer mental or physical exhaustion of a juror. *Commonwealth v. Martin, supra,* 379 Pa. at 593, 109 A.2d at 328.

It is reversible error to deny a defendant the right to poll the jurors, for to do so is a "denial of a right of the accused so fundamental as to require a retrial even though . . . the trial was otherwise markedly free from error and the jury's verdict was fully warranted by the evidence . . . [I]t is better that the case be tried again than that a precedent impairing a defendant's right to a poll of the jury be engrafted on our criminal procedure." *Commonwealth v. Martin, supra,* 379 Pa. at 592, 109 A.2d at 327. *And see Commonwealth v. Pacini, supra,* 224 Pa.Super. 497, 307 A.2d 346 (1973).

Here we are not faced with an outright refusal by the trial judge of a request by counsel to poll the jurors. What is at issue is whether the trial judge by instructing the jurors to initial their verdict slips in case of polling, so restricted the jurors' freedom to formulate independent decisions and to change their minds after announcing their verdict as to have worked a *de facto* denial of appellant's right to poll.

We disapprove of the trial judge's instruction, and take this occasion to say that it should not be used again, for it runs too great a risk of diminishing, or undermining, a fundamental right of the accused. Were this case close, we should award a new trial, so that that risk might be entirely avoided. As noted above, however, the evidence of the robbery and of appellant's participation is so strong that we do not believe that a new trial is required. Other parts of the judge's instruction made it clear that each juror must make an independent judgment of appellant's guilt. The judge charged that "each juror must decide the case for himself," and should not agree to a verdict if it does "violence to individual judgment." (N.T. 904) The judge further charged that "a juror should not hesitate to reexamine his own views and change his opinion if convinced it is erroneous." (N.T. 904). Given these instructions, we believe that it would be an overstatement to say that the

instructions to initial their verdict slips worked a *de facto* denial of appellant's right to poll the jurors.

Affirmed.

PRICE, J., concurs in the result.